Susan Regan McKILLOP,
Plaintiff,
v.
REGENTS OF the UNIVERSITY OF CALIFORNIA et al., Defendants.

No. C-73-1038-CBR.

United States District Court,
N. D. California.

Jan. 2, 1975.

---

4. See Opinion and Order of December 11, 1974, at P. 19 et seq.; *see also* Phillips v. Money, *supra* at N. 1.

Wendy W. Williams, Nancy L. Davis, Mary C. Dunlap, Joan M. Graff, Equal Rights Advocates, Davis, Dunlap & Williams, San Francisco, Cal., for plaintiff.

Donald L. Reidhaar, Milton H. Gordon, Norman I. Lustig, Berkeley, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

RENFREW, District Judge.

In 1970 Dr. Susan Regan McKillop was denied tenure in the Art Department of the University of California at Davis. She now challenges that denial, setting forth essentially two claims: first, that the University, in denying her tenure, discriminated against her on the basis of her sex in violation of the United States Constitution and certain federal statutes, and second, that she was denied tenure without notice of the reasons for denial, and without an opportunity to be heard, thereby depriving her of liberty without due process of law in violation of the Fourteenth Amendment.

As part of her discovery efforts, plaintiff requested that defendants produce the following documents: all papers, letters, forms, reports and other documents included in the personnel files of the University concerning her hiring, evaluation, promotion and denial of ten-

ure. Defendants produced documents which were written to or by plaintiff or which were otherwise provided to her in the normal course of University of California academic personnel procedures. Defendants refused, however, to provide (1) documents which were submitted or written in official confidence by University faculty members, administrators and committees and by scholars at other institutions and (2) documents which were written by or to defendants to or by its attorneys. In both instances the ground for refusal was privilege, as to the first category of documents, the privilege for official information, and, as to the second category, the attorney-client privilege.

Plaintiff conceded the propriety of the assertion of privilege as to attorney-client communications but moved to compel production of the documents allegedly protected by the official information privilege. On April 17, 1974, the Court orally denied this motion.

Plaintiff thereafter submitted a second request for production of documents. This request sought all written materials in the personnel files of (1) persons currently in tenure-track positions [1] in the Art Department of the University of California at Davis, (2) persons who now hold or have held tenure positions in the Art Department of the University of California at Davis, and (3) persons who have been in tenure-track positions in the Art Department of the University of California at Davis and who have been denied tenure. As with plaintiff's personnel file, defendants produced those documents in the specified files which were written by or to the persons involved or provided to them in the normal course of academic personnel procedures but refused to produce those documents submitted or written in official confidence.

Plaintiff now moves to compel the production of those documents which de-fendants refused to provide in response to her second request, and renews her motion to compel production of the documents from her own file which were withheld on the same basis. In the alternative, plaintiff requests that the Court certify to the United States Court of Appeals for the Ninth Circuit the question of her access to the documents involved, pursuant to 28 U.S.C. § 1292(b).

For the reasons set forth below, the Court concludes that the documents are protected by the privilege for official information and therefore denies plaintiff's motion to compel their production. Further, the Court finds that, at this stage of the litigation, the denial of access to the documents in question does not constitute an appealable interlocutory order under the standards set forth in 28 U.S.C. § 1292(b).

### 1. *The Privilege Question*

■ Rule 26 of the Federal Rules of Civil Procedure set forth the following general rule regarding discovery:

> "Parties may obtain discovery regarding any matter, *not privileged,* which is relevant to the subject matter involved in the pending action * * *." (emphasis supplied)

In applying this mandate to the instant problem the Court confronts a threshold choice of law issue. Plaintiff strenuously argues that in a case, such as the present action, predicated upon federal law, a district court must apply a federal standard to privilege questions. Defendants, on the other hand, contend that controlling authority requires deference to the applicable state rule of privilege. Both parties concede that the leading case on the choice of law question in this Circuit is Baird v. Koerner,

---

[1]. A tenure track position is apparently one in which the appointee is required to receive certain promotions within specific time periods ultimately leading to a tenured position.

Failure to receive either the promotion or tenure is a basis for denial of reappointment.

279 F.2d 623 (9th Cir. 1960).[2] *Baird* involved an attempt by the Internal Revenue Service to compel an attorney to divulge the identity of his client. To decide this question the court had first to consider whether the availability of the attorney-client privilege in a federal question case was governed by federal common law or the law of the *forum* state. The court there concluded that the law of the forum state controlled.

279 F.2d at 632. The result reached in *Baird* was based upon a solicitude for the important state interest in safeguarding the confidentiality necessary to foster certain relationships.[3] As such, *Baird* cannot be limited to the specific facts of that case nor to the precise privilege considered therein; rather it sets forth a principle applicable to privilege questions in general.[4] To deter-

2. Plaintiff has cited authority from the Fifth Circuit which would dictate a resolution of the choice of law issue contrary to that reached here. Those cases, which are discussed at length in note 15, *infra*, are at odds with the principle enunciated in *Baird*, and are thus unpersuasive in this action.

3. The court alluded at several points to the policy arguments supporting deference to state privileges in federal question cases. After noting that the United States Constitution does not *require* deference, as it does in diversity cases governed by the principles of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the court went on to conclude that such deference is desirable. The court quoted with approval the observation by another court faced with a similar problem that it "would not be justified in ignoring such a clear and unequivocal pronouncement of the public policy of the state in which it sits." 279 F.2d at 629. The court noted that the applicable California policy was set forth in § 1881 of the California Code of Civil Procedure. That section provided:

"There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate." 679 F.2d at 633.

Plaintiff does not seriously dispute the contention that *Baird* rests on recognition of the state policies which underlie the attorney-client privilege. Rather, she argues that this deference should be limited to that particular privilege. For a consideration of this argument, see note 4, *infra*.

4. Plaintiff isolates two aspects of the attorney-client privilege which, she argues, distinguish it from the official information privilege for purposes of applying the *Baird* principle: First, that the attorney-client privilege is of ancient origin whereas the official information privilege is more recent, and second, that attorneys in contrast to institutions of higher learning, are uniquely a creation of state law. Neither ground for limiting *Baird* to the attorney-client privilege withstands analysis.

With respect to the first ground, historical research suggests that the distinction is overstated and, in any event, if does not affect the thrust of *Baird*. The official information privilege has its roots in the common law privilege for military and diplomatic secrets. See generally 8 Wigmore, Evidence, § 2378 (3d Ed. 1961). In California it was included, along with the attorney-client privilege and others, in the original statutory codification of privileges in 1851, at the very inception of statehood. The present Evidence Code provision, § 1040 derives from that codification which read in pertinent part:

"A public officer shall not be examined as a witness as to communications made to him in official confidence, when the public interest would suffer by the disclosure." Stats.1851, c. 5 p. 114 § 399.

The official information privilege, then, cannot fairly be characterized as "new" or "recent", although it may well be that the common law origins of the attorney-client privilege antedate the common law developments which culminated in the official information privilege.

Furthermore, focusing on the relative ages of these two privileges ignores the thrust of *Baird*. As discussed in note 3, *supra*, *Baird* rests on solicitude for the state policies which underlie the determination to make certain communications privileged. The strength of those policies with respect to any particular privilege cannot be measured simply by the length of time during which that privilege has been recognized.

Plaintiff's second suggested ground for distinguishing *Baird* is similarly unpersuasive. It may indeed be accurate to characterize attorneys as "creatures" of state law. Agencies and institutions established by state law, such as the University of California, are, however, equally creatures of state law. That aspect of the attorney-client privilege cannot serve as a basis for declining to extend *Baird* to the official information privilege.

Finally, the *Baird* opinion itself contains a strong indication that the choice of law principle enunciated therein cannot be limited to

mine, therefore, the availability of a privilege for official information with regard to the documents sought by plaintiff, the Court turns to the law of the State of California, specifically § 1040 of the California Evidence Code. That section provides:

"(a) As used in this section, 'official information' means information acquired in confidence by a public employee in the course of his duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.

"(b) A public entity has a privilege to refuse to disclose official information, and to prevent another from disclosing such information, if the privilege is claimed by a person authorized by the public entity to do so and:

"(1) Disclosure is forbidden by an act of the Congress of the United States or a statute of this state; or

(2) Disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice; but no privilege may be claimed under this paragraph if any person authorized to do so has consented that the information be disclosed in the proceeding. In de-

termining whether disclosure of the information is against the public interest, the interest of the public entity as a party in the outcome of the proceeding may not be considered."

■ Defendants first contend that the documents sought by plaintiff are within the "absolute" privilege provided in § 1040(b)(1). They argue that Section 51 of the Administrative Manual of the University of California, promulgated by the President of the University pursuant to a delegation of authority from the Regents, forbids disclosure of these documents [5] and that the regulations contained in that Manual are to be considered statutes of the State of California within the meaning of § 1040(b)(1). Defendants rely on Hamilton v. Regents of the University of California, 293 U.S. 245, 55 S.Ct. 197, 79 L. Ed. 343 (1934) in support. That case held that an order of the Regents of the University was a state statute for purposes of sustaining jurisdiction under the provision for review, by appeal, in the United States Supreme Court of state judgments "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity." [6] The suggest-

the attorney-client privilege. In reaching its conclusion on the choice of law question, the court relied primarily on cases involving the physician-patient privilege and the journalist's privilege, not the attorney-client privilege itself. 279 F.2d at 628–629.

5. Section 51 of the Administrative Manual provides in pertinent part:
"51–0 *Policy*
"In their deliberations and preparations of reports and recommendations, academic review and appraisal committees shall be guided by the policies and procedures set forth in the respective 'Instructions' which appear below.
"51–1 *Instructions to Review Committee Which Advise on Actions Concerning Appointees in the Professor and Corresponding Series*
"The following instructions apply to review committees for actions concerning appointees in the professor series and the professor in

residence series; and, with appropriate modifications, for appointees in the adjunct professor series.
\* \* \* \* \*
"b. *Maintenance of the Committee's Effectiveness*
"(1) THE MEMBERSHIP, DELIBERATIONS, AND RECOMMENDATIONS OF THE REVIEW COMMITTEE ARE STRICTLY CONFIDENTIAL. The chairman of an appointment or promotion committee should remind members of the committee, and others whom it is essential for the committee to consult, of the confidential nature of the assignment. This should be kept in mind for arranging for all written or oral communications; and when recommendations with supporting documents have been forwarded, all copies or preliminary drafts should be destroyed."

6. 28 U.S.C. § 1257(2) (formerly 237(a) of Judicial Code, 28 U.S.C. 344(a)).

ed analogy between 28 U.S.C. § 1257 and § 1040 of the California Evidence Code is unpersuasive. The broad reading of the term "statute of any state" in 28 U.S.C. § 1257(2) rests on the policy of ensuring Supreme Court review of allegedly unconstitutional state action with potentially far reaching impact and the recognition that "[u]nlike other state action, legislation consists of rules having continuing force and intended to be observed and applied in the future; and this regardless of the state agency from which it proceeds." King Mfg. Co. v. Augusta, 277 U.S. 100, 104, 48 S.Ct. 489, 490, 72 L.Ed. 801 (1928). In contrast, the relevant policy considerations militate strongly in favor of a narrow construction of the words "statute of this state" in § 1040(b)(1) of the California Evidence Code. The official information privilege, like the other enumerated privileges, is an exception to the basic policy of full disclosure in litigation.[7] It would be most inappropriate, therefore, to construe § 1040(b)(1) in such a way as to maximize the amount of information protected under the mantle of absolute privilege. For this reason the Court concludes that the term "statute of this state" in § 1040(b)(1) comprehends only enactments of the state legislature and not regulations promulgated by a state instrumentality such as those contained in the Administrative Manual of the University of California.[8]

Since defendants have not cited, and independent research has not revealed, any enactment of the state legislature which forbids disclosure of the documents sought by plaintiff, in order to resolve the privilege question presented here, the Court turns to section 1040(b)(2).

Section 1040(b)(2) requires the Court to balance the necessity for preserving the confidentiality of the information sought against the necessity for its disclosure in the interest of justice. In regard to the first element of this balance, the defendants contend that the efficacy of the peer recommendation system for faculty selection at the University of California hinges on preserving the confidentiality of evaluations submitted or made in connection therewith. At the outset the Court notes that this system of faculty selection has produced one of the finest, if not the finest, institutions of higher education in the country, and certainly the pre-eminent state university system.[9] The Court notes further that the high level of excellence which characterizes the University of California is not a static and immutable status quo; rather it represents a fragile equilibrium of many elements which requires constant effort to maintain. It is a continuing process, not a fixed state.

Plaintiff does not dispute the excellence of the University. She does, however, contest the assertion that disclosure of the information sought here would threaten that degree of excellence. Plaintiff's arguments on this score are unpersuasive. First, she urges that confidentiality is not a prerequisite to can-

---

7. Cal.Evidence Code § 911.

8. The legislative history of § 1040, although it does not deal directly with this question, supports the conclusion reached here. Prior to the enactment of § 1040 of the Evidence Code, official information was protected either by the conditional privilege of § 1881, subdivision 5, of the Code of Civil Procedure (which had been, until 1872, section 399 of the Civil Practice Act of 1851, discussed in note 4, *supra*) or by a specific state statute forbidding its disclosure. Subsection b(2) of section 1040 was intended to supersede § 1881, subdivision 5 and subdivision b(1) was inserted to ensure that the specific state code provisions protecting certain types of official information remained in effect. See Cal.Evidence Code § 1040 (West 1966), Comment—Assembly Committee on Judiciary. Given this rationale for the inclusion of section b(1), then, it appears that the term "statute of this state" refers only to the legislation enacted by the state legislature.

9. In the two most recent surveys of graduate departments in the United States by the American Council of Education, the University of California's Berkeley campus has been ranked first. See A. Carter, An Assessment of Quality in Graduate Education (1966) and K. Rouse and C. Anderson, A Rating of Graduate Programs (1970).

did evaluation of tenure candidates. Indeed, she argues that a policy of full disclosure would encourage thoughtful and honest opinions by those who are asked to evaluate a candidate. By way of buttressing this argument, plaintiff directs the Court's attention to the policy adopted by the University of Oregon permitting limited disclosure of evaluations submitted or made in connection with the tenure selection process. Plaintiff's suggestion that full disclosure encourages more thoughtful and honest tenure evaluations represents a somewhat utopian view of human relationships. It is a view which does not accord with that of the University-level faculty members on record here,[10] nor with the Court's own experience in dealing with recommendations and the like. Indeed, the policy adopted by the University of Oregon does not support plaintiff's contention. In the first place it is clear that that university has not yet attained, and perhaps does not strive to attain, the stature which the University of California has achieved. More importantly, the newly adopted policy of limited disclosure at that institution in no way reflects repudiation of the principle that confidentiality is a prerequisite to the effectiveness of a peer evaluation system of faculty selection. Rather, it represents a slightly different view of what is necessary to insure that confidentiality is maintained.[11]

Plaintiff argues, secondly, that regardless of the general need for confidentiality to insure the successful operation of a peer evaluation system, occasional and selective disclosure in lawsuits challenging promotion decisions cannot destroy the overall effectiveness of that system. Plaintiff's discovery request refutes this argument. By her own characterization, she seeks production of the confidential personnel files of all members of the Art Department at University of California, Davis, since the inception of that department. Acceding to such a request could hardly constitute selective disclosure. Moreover, this Court cannot assume that lawsuits of this type which present equivalent justification for disclosure would be rare; indeed they would probably be quite frequent. Disclosure of the mate-

10. Defendants have submitted two affidavits, one by the Chancellor at University of California, Davis, and one by the Vice President —Academic Affairs at the University of California, which strongly emphasize the need for confidentiality in the tenure selection process. Plaintiff's only countering affidavit is from the Executive Secretary of the University Council—American Federal of Teachers. This individual is not a member of any faculty but a career administrator for labor organizations. His opinion about the relationship between full disclosure of personnel files and responsible and careful evaluations is based upon his experience working for a professional association of registered nurses. The Court does not find that professional evaluation decisions regarding nurses can be analogized to tenure selection decisions concerning university-level faculty members. The affidavit therefore is unpersuasive on the issue before the Court.

11. A careful reading of the regulations governing faculty records at the University of Oregon, submitted as an exhibit to plaintiff's First Memorandum of Points and Authorities in Support of the Motion to Compel, confirms this view. The regulations provide that the substance of any evaluations must be disclosed to the faculty member involved. The verbatim language of each evaluative statement must be disclosed only to the extent that the confidentiality of the evaluator's identity is not jeopardized. Further, the cover letter to the regulations by the President of the University makes very clear that preserving the confidentiality of the identity of the evaluators is absolutely critical to the proper functioning of the tenure selection process, and that the regulations were drafted with this concern in mind. Since the University of California here has disclosed the substance of the evaluations to plaintiff and since its reluctance to divulge the precise text of the evaluations stems from the desire to ensure that the identity of the evaluators is not disclosed, it appears that there is no substantial inconsistency between the policy followed at the University of California in regard to personnel files and policy embodied in the regulations in effect at the University of Oregon. At most the Oregon policy reflects a slightly different view of the likelihood that disclosure of verbatim portions of the test of evaluations will compromise the identity of evaluators.

rial sought here, then, cannot be deemed an insubstantial threat to the operation of the peer evaluation system at the University of California. The Court therefore concludes that the University has established the necessity for preserving the confidentiality of the documents withheld in response to plaintiff's discovery request.

The Court's inquiry, of course, does not end here. It remains to consider the plaintiff's need for disclosure in the interest of justice. In assessing this need, the Court is mindful of the strong federal interest in redressing sex-based discrimination in employment and the federal policy of ensuring access to public information.[12] Essentially plaintiff contends that without the material sought here, she cannot proceed with her case. This contention, however, ignores both the thrust of her complaint and the alternative means of discovery available to her. Since she complains of the denial of tenure by the University of California, the focus of her case must be the actions and state of mind of the individuals responsible for that decision. To the extent that plaintiffs seeks production of the files in the hope that the evaluations themselves contain evidence bearing on this central question, plaintiff has had, and continues to have, an alternative method of discovery: the Court's suggestion, to which defendants have agreed, that an impartial academician review the files to determine whether any implication of discrimina-

12. The Freedom of Information Act, 5 U.S. C. § 552, does not, of course, apply to the materials sought here, since the University of California is not an "agency" within the coverage of that act. 5 U.S.C. § 551. To the extent, however, that it reflects a general federal policy favoring public access to the records of government agencies, that policy has been considered here.

The Court has also taken note of the recent enactment of a statute concerning access to student records. That statute, Education Amendments of 1974, provides in pertinent part:

"Sec. 438. (a) (1) No funds shall be made available under any applicable program to any State or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution which has a policy of denying, or which effectively prevents, the parents of students attending any school of such agency, or attending such institution of higher education, community college, school, preschool, or other educational institution, the right to inspect and review any and all official records, files, and data directly related to their children, including all material that is incorporated into each student's cumulative record folder, and intended for school use or to be available to parties outside the school or school system, and specifically including, but not necessarily limited to, identifying data, academic work completed, level of achievement (grades, standardized achievement tests scores), attendance data, scores on standardized intelligence, aptitude, and psychological tests, interest inventory results, health data, family background information, teacher or counselor ratings and observations, and verified reports of serious or recurrent behavior patterns. Where such records or data include information on more than one student, the parents of any student shall be entitled to receive, or be informed of, that part of such record or data as pertains to their child. Each recipient shall establish appropriate procedures for the granting of a request by parents for access to their child's school records within a reasonable period of time, but in no case more than forty-five days after the request has been made.

\* \* \* \* \*

"(d) For the purposes of this section, whenever a student has attained eighteen years of age, or is attending an institution of post-secondary education the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student." Section 513 of the Education Amendments of 1974, PL 93–380.

Several points are worth noting in connection with this statute. First, and most importantly, it does not affect access to files of faculty members. Secondly, it is not at all clear that the statute was intended to permit access to confidential recommendations, evaluations and the like and several major universities are withholding such documents from students on this basis. San Francisco Chronicle, November 19, 1974 (p. 2, col. 1). Finally, to the extent that the statute may authorize access to such documents, its author will reportedly introduce amendments designed to deal with the problem. San Francisco Chronicle, November 19, 1974 (p. 2, col. 3).

In sum, the new student records statute neither specifically, nor by analogy, compels disclosure of the documents sought by plaintiff here.

tion arises therefrom. Plaintiff has so far declined to pursue this alternative. Indeed, plaintiff's counsel has, with admirable candor, conceded that she expects to find no such evidence in the evaluations themselves. Rather she indicates that in those circumstances she might need to depose the authors of the evaluations to determine whether they harbor any bias against women.[13]

It is highly unlikely that such depositions would be permitted. The connection between the bias of an evaluator, undetectable from the face of the evaluation, and the propriety of the actions taken by the decision makers on the basis of such an evaluation is extremely tenuous. Furthermore, to allow depositions would require that the identity of the evaluators be disclosed in addition to the text of the evaluations. Such disclosure would represent the most serious breach of the confidentiality of the tenure selection process, a breach which even proponents of limited disclosure have opposed.[14]

To the extent then that the material sought here contains information bear-

ing on the actions and state of mind of the individuals responsible for her tenure denial, the Court has suggested an adequate alternative to production of the documents as a means of discovery. Even more significantly, perhaps, plaintiff has available a discovery option which focuses directly on the actions and state of mind of the University decision makers here: She can depose these individuals and, to those who are parties to this action, she can direct interrogatories.

■ In sum, the Court finds that on the particular facts of this case in its present posture, the University's need to preserve the confidentiality of the tenure files in question decisively outweighs the plaintiff's need for their production. Plaintiff's motion to compel production of these documents will therefore be denied on the ground that the materials sought are privileged under § 1040(b)(2) of the California Evidence Code.[15]

## 2. *The Certification Question*

■■ In the alternative to her motion to compel production of the docu-

13. It may also be that plaintiff wishes to impeach the evaluations themselves by introducing evidence directed to the question of Ms. McKillop's qualifications and stature as Renaissance Art Historian. The Court is simply not in a position to decide this question; to do so would require subjective judgments which are meaningless if made by one without expertise and experience in the field. See Faro v. New York University, 502 F.2d 1229 (2d Cir. 1974). To the extent, therefore, that plaintiff seeks disclosure of the evaluations to facilitate presentation of this issue, disclosure is unnecessary.

14. As discussed in note 10, *supra,* the University of Oregon, which recently adopted a somewhat liberal disclosure policy, has structured that policy to ensure that the identity of evaluators is kept confidential. Even more significantly, perhaps, plaintiff's single affiant and the organization which he represents have also taken the position that disclosure of academic personnel files should not include disclosure of the identity of evaluators.

15. Although the Court has found that state law rather than federal law controls the privilege question, application of federal law would also mandate the result reached here.

In her original memorandum of points and authorities, plaintiff took the position that whether the claim of privilege was treated as claim of executive or governmental privilege under federal law or a claim of conditional privilege for official information under state law, the balancing process necessary to determine the propriety of the privilege was essentially the same. Plaintiff has subsequently retreated from this position. She now contends that the application of federal law would require a different balancing process in which federal policy considerations would weigh more heavily. This contention misconceives the fundamental nature of the weighing process. Both § 1040(b)(2) of the California Evidence Code and the federal standard of executive or governmental privilege require the Court to balance competing interests in relation to particular and unique sets of facts. For this reason, in applying the state privilege to this case, the Court has not found helpful, and therefore has not relied upon, the California cases cited to it. Each of those cases involves a particularized analysis of interests and facts which differ from those before this Court.

Similarly, the Court has not found it helpful to speculate about what a California court might do if faced with the precise situation presented here. The relevant inquiry is not

ments here, plaintiff requests that the Court certify the order denying that motion for appeal to the United States Court of Appeals for the Ninth Circuit under 28 U.S.C. § 1292(b).[16] That section sets forth three criteria for use in determining the propriety of an interlocutory appeal; the order must involve a controlling question of law, there must be substantial grounds for difference of opinion as to that question, and an immediate appeal must have the potential to materially advance the ultimate termination of the litigation. These crite-

ria must be interpreted against a background of the strong federal policy of avoiding piecemeal appeals: "1292(b) is to be applied sparingly and only in exceptional cases." United States v. Woodbury, 263 F.2d 784, 788 n. 11 (9th Cir. 1959). See also House of Representatives Report No. 1667, p. 2 (April 29, 1958).

In applying the standards set forth in § 1292(b) to the facts of this case, the Court is not without guidance from the Court of Appeals for this Circuit; both

whether a California judge might, as a practical matter, give more weight to state concerns in applying a balancing test under state law than would a federal judge applying a balancing test under federal law; rather the question is whether a federal judge would employ a different balancing test depending on whether the balancing is to be done pursuant to a state law or to federal law.

This latter question must be answered in the negative. In analyzing this privilege question under California law the Court has accorded full weight to the important federal interests in redressing sex discrimination and ensuring freedom of information. Changing the label of the balancing test from state to federal would not increase the weight given to those interests.

Moreover, even if the Court were to concede that a federal balancing test would differ somewhat, in terms of emphasis, from a state test, application of a federal test would not change the result reached here. To support her claim that the documents sought would not be protected under the federal common law of executive or governmental privilege, plaintiff relies primarily on two cases from the Fifth Circuit, Fears v. Burris Mfg. Co., 436 F.2d 1357 (5th Cir. 1971) and Carr v. Monroe Mfg. Co., 431 F.2d 384 (5th Cir. 1970). Both cases involved claims of discrimination in the hiring of factory employees in violation of Title VII of the Civil Rights Act of 1964. In each case plaintiff had sought certain documents in the personnel files of a state employment agency which were claimed to be absolutely privileged under state law, and the District Court had held that the privilege was unavailable. In each case the Court of Appeals for the Fifth Circuit affirmed the District Court, holding that (1) federal not state law governed the privilege question, 436 F.2d at 1361, 431 F.2d at 388, (2) the availability of the federal governmental or executive privilege was to be determined by weighing the potential harm from disclosure of a given communication against the benefits of disclo-

sure, 436 F.2d at 1362, 431 F.2d at 390, and (3) the trial court had not abused its discretion in balancing the competing interests, 436 F.2d at 1362, 431 F.2d at 390. Two points are worth noting in respect to these decisions. First, although in both cases the Court indicated its approval of the district court's resolution of the balance in favor of disclosure, neither court in any way intimated that a contrary resolution would have constituted an abuse of discretion. Second, and even more importantly, the potential harm from disclosure in the instant case far exceeds that which was present in Carr or Fears, supra. There, the concern was that disclosure would inhibit candid communications necessary to an effective job referral service. It appears to this Court that society can far better afford a sacrifice in the efficacy of job referrals for factory employees than it can a sacrifice in the efficacy of a tenure selection system which has as its goal and has produced a faculty of truly outstanding scholars. For these reasons, the Court, applying the standard enunciated in Carr and Fears, supra, to the facts of this case, finds that the potential for harm from disclosure outweighs any benefits which might flow therefrom.

16. Section 1292(b) provides:

"When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

sides agree that the leading case on the question of certification is United States v. Woodbury, 263 F.2d 784 (9th Cir. 1959). In that case the issue which was asserted to be a controlling question of law was whether the government was entitled to withhold certain documents under a claim of privilege. The Court concluded that, though a question need not be dispositive of the case to be "controlling", an appeal was not proper where the question was collateral to the basic issues of the case and where resolution of the question would not terminate the lawsuit, or prevent the fruits of the lawsuit from being lost. Applying these criteria to the privilege question in that case, the Court declined review under § 1292(b). 236 F.2d at 787–788. Although plaintiff has suggested several grounds for distinguishing *Woodbury* and has cited authority which she contends supports certification of the privilege question on these facts, the Court is persuaded that the principles announced in *Woodbury* and the strong federal policy of avoiding piecemeal appeals dictate denying certification at this stage of the litigation.[17]

17. Plaintiff suggests several grounds for distinguishing *Woodbury*. First, she argues that *Woodbury* involved an order requiring the production of documents argued to be privileged, whereas the order in this case denies the motion to produce the allegedly privilege material. This difference is significant, she urges, because in the former situation the party seeking appellate review can withhold the documents, suffer a dismissal of the action and immediately appeal from the dismissal, thus obviating the need for interlocutory review. Here she argues no such possibility of a speedy appeal exists. Plaintiff's suggested distinction is unpersuasive. The speedy appeal option which was available to the Government in *Woodbury* in fact would have involved a major gamble. Indeed, the Court in *Woodbury* noted the dilemma which confronted the Government and considered it as a factor which militated *in favor* of interlocutory appeal. The court concluded, however, that the strong policy against piecemeal appeals outweighed the Government's need to be relieved of a difficult choice of litigation strategy. That same strong federal policy applies to this case, and no comparable dilemma confronts the plaintiff.

Plaintiff's second suggested distinction of *Woodbury* focuses on the choice between state and federal standards for determining the availability of the privilege. She contends that *Woodbury* stands for the proposition that the choice between state and federal law can be a controlling question of law for purposes of § 1292(b). *Woodbury* does indeed stand for this proposition but with the crucial qualification that to be certifiable a choice of law question must as a practical matter present "the prospect that unless the order * * * were reversed in the early stages of the suit all or a part of the fruits of the litigation would be lost to the plaintiff." 263 F.2d at 787. In the instant situation waiting to appeal from any final judgment risks no such loss of the fruits of

litigation. Even more importantly, if it were determined on appeal that the Court had erred in its choice of state law, application of the federal standard to the privilege question here would not alter the disposition of plaintiff's motion. See discussion in note 15, *supra*.

In addition to her attempts to distinguish *Woodbury*, plaintiff, at oral argument, invited the Court's attention to Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970). The case involved, among other issues, the question of whether a corporation's privilege for attorney-client communications was available against the shareholders of that corporation. The trial court determined that the privilege was not available and granted the motion to produce. The Court of Appeals held that this order was reviewable under § 1292(b). In reaching this conclusion the Court relied heavily on its determination that the availability of the attorney-client privilege was "a 'controlling question of law' as opposed to a question of fact or matter for the discretion of the trial court." 430 F.2d at 1096–1097. The availability of the conditional privilege for official information under § 1040 by the California Evidence Code is matter for the discretion of the trial judge, see Terzian v. Superior Court, 10 Cal. App.3d 286, 294–295, 88 Cal.Rptr. 806, 812–813 (1970), as is the availability of the federal governmental or executive privilege. See *Carr, supra,* 431 F.2d at 389 and *Fears, supra,* 436 F.2d at 1362.

The *Carr* decision, rendered by the same court which decided *Garner*, and indeed authored by the same judge, indicates that this distinction is significant. In *Carr* the trial judge denied the availability of the governmental or executive privilege, asserted on behalf of both parties to that action and a nonparty. The Court of Appeals held that insofar as the privilege was asserted on behalf of the nonparty, the order denying its availability was reviewable as a *final* order

Fundamentally, all plaintiff's arguments in favor of certification are premised on her assertion that without the documents in question she cannot proceed with her case. The Court has thoroughly considered this assertion in connection with its analysis of the privilege question, *supra*, and has found that, given the discovery alternatives available to her, it does not represent an accurate assessment of her position.

The Court thus finds that, at least until all other discovery options have been pursued, the order denying plaintiff's motion to compel production of documents does not involve a controlling question of law about which there are substantial grounds for disagreement, the resolution of which would materially advance the ultimate termination of this litigation. Accordingly,

It is hereby ordered that plaintiff's motion to compel production of documents is denied.

It is hereby further ordered that plaintiff's request for certification of this order to the United States Court of Appeals for the Ninth Circuit for an interlocutory appeal is denied.

under 28 U.S.C. § 1291, but that insofar as the privilege was asserted on behalf of parties, "no provision of § 1292 allows this appeal." 431 F.2d 384 at 386. Since no claim has been made, and none successfully could be made, that the instant order is a final order within the meaning of § 1291, it is clear that even in the Fifth Circuit no appeal would lie at this stage.

Moreover, even if it were to be determined that an appeal under § 1292(b) would be granted in the Fifth Circuit on these facts, this Court's duty to follow *Woodbury* would remain unchanged.