**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**UNIVERSITY OF NOTRE DAME DU LAC, Defendant.**

**No. S 82–104.**

United States District Court,
N.D. Indiana,
South Bend Division.

Aug. 5, 1982.

Bernard Huff, Michael J. Connolly, James N. Finney, Washington, D.C., Laurie A. Young, Richard R. Trujillo, E.E.O.C., Indianapolis, Ind., for plaintiff.

Philip J. Faccenda, University of Notre Dame, Notre Dame, Ind., Gerald D. Skoning, Lawrence C. DiNardo, Robert C. Long, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

This case is before the Court on the application of the Equal Employment Opportunity Commission (EEOC) for an order to show cause why a subpoena issued to respondent, University of Notre Dame Du Lac (University) should not be enforced. Oral argument was heard before this Court on May 6, 1982 and both parties have submitted extensive briefs on the issues.

On May 21, 1980, Oscar T. Brookins filed a charge with the EEOC alleging that the University had committed and continues to commit unlawful employment discrimination at its principal facility in Notre Dame, Indiana. Specifically, Mr. Brookins alleged in EEOC Charge No. 053801641:

> I began employment with the above stated respondent in August, 1974, as Assistant Professor of Economics. I received a one year terminal contract on May 13, 1980 which denied me tenure as a permanent professor.
>
> I feel that I have been discriminated against because of my face (sic—race), Black, in that:
>
> 1. No Black professor has ever received tenure from the Economics Department.
>
> 2. The University refused to state to me in writing why I was being denied tenure.
>
> 3. My publications are of greater or equal quality and of greater or equal number than most tenured professors within the Department of Economics.
>
> 4. The Chairman of The Department of Economics has made the statement

to my wife that he doesn't believe that races should be mixed. My wife is White.

5. Chairman and Dean have refused to identify external and internal reviewers of my performance. Further, they have refused to allow me to read these reviewer's comments.

6. Those persons and committees reviewing me for tenure have used student's teacher-course evaluations as the measure of my competency to teach.

7. The Department of Economics has refused to provide copies of its member's vitaes to me. According to the University's rules, I have a right to see the vitaes.

The EEOC served notice and a copy of the charge on the respondent University and commenced its investigation. On January 7, 1981, the EEOC sent the University a questionnaire which contained eight requests for information and documents with numerous subparts. The University complied with each of the requests for information and documents on February 6, 1981, except for the EEOC's request that the University furnish copies of the personnel records of the charging party, Oscar T. Brookins. With respect to those personnel records, the University offered to allow an EEOC investigator to visit the University to personally review the charging party's personnel files but refused to permit the EEOC to make copies of the file on the grounds that its contents were confidential.

On February 19, 1981 the EEOC by letter to the University requested the personnel files of the charging party and other teaching personnel in the Economics Department. On March 3, 1981 the University responded by offering to produce the files subject to the execution of a nondisclosure agreement which would insure that the files would remain confidential. The EEOC in return correspondence declined to sign the nondisclosure statement maintaining that Title VII of the Civil Rights Act of 1964 prohibits public disclosure and that the University should therefore comply with the request. After further correspondence the

EEOC issued subpoena number IN–81–005 to respondent University on July 1, 1981 requesting the production of certain evidence and directing the University to produce the evidence on July 17, 1981 at the Indianapolis District Office of the EEOC.

On July 21, 1981 the University filed a Petition to Revoke or Modify Subpoena with the General Counsel of the EEOC and forwarded a copy to the District Director. In a determination issued on August 31, 1981, the District Director of the Indianapolis District Office of the EEOC denied the respondent's petition to revoke or modify the subpoena and ordered the University to produce the documents. On August 12, 1981, the University appealed to the Commission from the District Director's determination denying its petition to revoke or modify the subpoena. On February 18, 1982 the Commission issued its determination denying the University's appeal and modifying the language of the subpoena to require production of the following evidence:

Copies of the complete personnel records of Charging Party, Oscar T. Brookins, and all other teaching personnel in the Economics Department for the period January 1, 1980, to the present are requested regardless of whether such teaching personnel were fired by Respondent before or after January 1, 1980, or left Respondent's employ after January 1, 1980.

The University did not comply with the subpoena as ordered. On March 16, 1982 the EEOC filed the application for order to show cause why the subpoena should not be enforced that is presently before the Court.

The University objects to the EEOC's subpoena on three grounds. First, the University maintains that the personnel files in question contain peer review evaluations which are made with the assurance and expectation that the evaluations would remain confidential. The University further maintains that disclosure of the evaluations would impair the rigor and integrity of the peer review process and thus impinge on society's interest in academic freedom and

excellence in higher education. The University therefore urges this Court to recognize a qualified academic privilege under Rule 501 of the Federal Rules of Evidence as well as under the Court's discretionary authority to regulate the conduct of discovery under Rule 26(c) of the Federal Rules of Civil Procedure. Second, the University objects to the breadth of the EEOC's subpoena. The EEOC subpoena requests the production of personnel files of all faculty members who have taught in the Department of Economics since January 1, 1980. The University maintains that most of the files requested are those of faculty members who are not similarly situated with the charging party and therefore proposes to produce only those files of faculty members in the Department of Economics who have been considered for tenure since January 1, 1976.

The University's third objection to the EEOC's subpoena is the EEOC's refusal to execute a nondisclosure agreement as a condition to the University's release of the files in question. The University maintains that it would be without a judicial forum in which to obtain a protective order to insure the confidentiality of the files once they are released to the charging party.

### I.

■ The University's first objection to the EEOC subpoena is that some of the information contained in the personnel files of faculty members covered by the subpoena is confidential and should be protected by a qualified academic privilege pursuant to Federal Rule of Evidence 501 or as a matter of the Court's discretion to limit and control discovery pursuant to Federal Rule of Civil Procedure 26. The University specifically seeks to protect the names and identifying information of the individuals who submitted evaluation of individuals being considered for tenure by deleting that information from the file. The EEOC maintains that it is entitled to the complete files and that the Court should summarily enforce the subpoena in its entirety pursuant to *EEOC v. Bay Shipbuilding Corp.,* 668 F.2d 304 (7th Cir.1981).

Rule 1101 of the Federal Rules of Evidence contains the guidelines for determining the applicability of the Federal Rules of Evidence to the matter now before the Court. Subsection (b) of Rule 1101 provides that "these rules apply generally to civil actions and proceedings, ..." Subsection (d) contains specific exceptions to the application of the rules and subsection (e) provides for instances when the Federal Rules of Evidence are applicable only in part. Thus, the general language of subsection (b), applying the rules to all "civil actions and proceedings", governs all civil proceedings in federal district court unless they are specifically mentioned in a subsequent section of Rule 1101.

An application for the enforcement of an administrative subpoena would be encompassed by the general language "civil action and proceedings" and is not included in the exceptions to the application of the rules nor in the section applying the rules in part. There is no case law authority on this issue nor does the legislative history of the rules indicate that administrative subpoena enforcement proceedings should be excluded from the application of the Federal Rules of Evidence. Therefore, this Court concludes that the rules apply to this proceeding for enforcement of the EEOC subpoena.

Subsection (c) of Rule 1101 of the Federal Rules of Evidence provides that the rule with respect to privileges applies at all stages of all actions, cases and proceedings. The law of privilege in this action is governed by Rule 501 of the Federal Rules of Evidence which provides as follows:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, state, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

In adopting Rule 501 Congress rejected a proposal to fix the law of privilege by codifying nine specific privileges and in doing so manifested an affirmative intention not to freeze the law of privilege. Its purpose rather was to "provide the courts with the flexibility to develop rules of privilege on a case-by-case basis," 120 Cong.Rec. 40891 (1974), and to leave the door open to change. *Trammel v. United States,* 445 U.S. 40, 47–48, 100 S.Ct. 906, 910–11, 63 L.Ed.2d 186 (1980). The *Trammel* court cautioned against recognition of privileges, however, without a careful examination of its effects on the underlying policies by stating that "privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence' [citations omitted]," and that they must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.* at 49, 100 S.Ct. at 912; see, *In re Dinnan,* 661 F.2d 426, 429–30 (5th Cir.1981). Thus, where there is no compelling justification for a new privilege, the truth seeking function of our justice system must prevail.

Wigmore, a leading commentator on the law of evidence, specifies four fundamental conditions which he asserts are necessary to establish a privilege against disclosure of communications. First, the communication must have been made with the understanding that it would not be disclosed. Second, the element of confidentiality must be essential to the full and satisfactory maintenance of the relationship between the parties. Third, the relationship must be one which in the opinion of the community ought to be sedulously fostered. Fourth, the injury that would inure to the relation by the disclosure of the communication must be greater than the benefit that would result from requiring the disclosure. Wigmore, Evidence § 2285, p. 527. Analyzing the facts of this case in light of the factors set forth by Wigmore, this Court holds that no privilege exists that would protect from disclosure the information at issue in this case.

The first three conditions cited by Wigmore as necessary to establish a privilege are supported by the record in this case. The written evaluations made by the reviewers as part of the peer review process were made with the understanding that they would not be disclosed. The facts also support a finding that the element of confidentiality is essential to the full and satisfactory maintenance of the relationship between the University and those who perform the evaluations of the faculty members being considered for tenure. The peer review process is the method used by the University to recruit, promote, and tenure those individuals who have the greatest potential for becoming outstanding scholars and teachers in their fields. This objective requires that the evaluations contain candid and critical appraisals of the candidates academic performance in order to insure that tenure decisions are based primarily on academic considerations. The University obtains the evaluations from the candidate's peers from the University and from eminent scholars at other universities who are often professional colleagues or acquaintances of the candidate. Without the assurances of confidentiality, the reviewers' evaluations would be less candid, if indeed given at all.

The third condition cited by Wigmore is that the relationship must be one which in the opinion of the community ought to be sedulously fostered. The societal interest in fostering excellence and freedom of thought in higher education cannot be gainsaid. "The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth." *Sweezy v. State of New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957). In his concurring opinion in *Sweezy,* Justice Frankfurter noted, "These pages need not be burdened with proof, based on the testimony of a cloud of impressive witnesses, of the dependence of a free society on free universities." *Id.* at

262, 77 S.Ct. at 1217. Included in Justice Frankfurter's essential elements of academic freedom is the right of a university " 'to determine for itself on academic grounds who may teach.' " *Id.* at 263, 77 S.Ct. at 1218, quoting *The Open Universities in South Africa* 12. The process of peer evaluations has evolved as the best and most reliable method of promoting academic excellence and freedom by assuring that decisions on tenure will be made objectively on the basis of frank and unrestrained critiques of the candidate's academic qualifications. See, *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1346 (W.D.Pa. 1977).

The final factor to consider in recognizing a privilege against disclosure of communications is that the injury that would inure to the relationship by the disclosure of the communication must be greater than the benefit that would result from requiring the disclosure. The University maintains that the disclosure of the names and identities of the reviewers would cause devastating damage to the peer review process and that the EEOC does not need that information to conduct its investigation. The facts and procedural posture of this case indicate otherwise.

The EEOC possesses broad, though not unlimited, investigatory powers as part of its authority to prevent violations of Title VII. 42 U.S.C. § 2000e–5. The sole limitation placed on the discovery procedures of the EEOC in the conduct of investigations triggered by charges under 42 U.S.C. § 2000e–5 is whether the information sought is relevant to or relates to any matter under investigation or in question. 42 U.S.C. § 2000e–8(a); 29 U.S.C. § 161(1). In *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), the Supreme Court of the United States stated that the standard for determining the limits of administrative powers of investigation is whether the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. The facts of the case presently before the Court indicate that the EEOC subpoena at issue meet the above standard.

The University argues, however, that *Morton Salt* was limited by the Seventh Circuit in *Dow Chemical Co. v. Allen,* 672 F.2d 1262 (7th Cir.1982). In *Dow Chemical,* the Court of Appeals stated that the disclosure of subpoenaed information may be restricted where compliance would force an unreasonable burden on the party from whom production is sought and that the determination of whether a particular burden is excessive must be made with reference to the particular facts of the individual case. *Id.* at 1269; see, *F.T.C. v. Shaffner,* 626 F.2d 32, 38 (7th Cir.1980). The Seventh Circuit further stated that the "resolution of the issue of reasonableness requires juxtaposition of need and probative value against burden of compliance." *Dow Chemical Co. v. Allen,* 672 F.2d at 1270. Based upon *Dow Chemical,* the University argues that the Court should permit the nondisclosure of the names because the information is not determinative and the burden placed on the University and more specifically, the peer review process, is substantial.

The University's reliance on *Dow Chemical,* however, is misplaced. First, *Dow Chemical* involved an adjudicative subpoena, rather than an investigatory subpoena, and the court specifically stated that the bounds of relevance tend to be broader in the investigatory context. 672 F.2d at 1268. Second, the burden contemplated by this test does not include the type of burden the University maintains exists in this case. Finally, the EEOC's need for obtaining the information is substantial. The EEOC needs all the relevant facts to determine whether reasonable cause exists to believe that the charge is true. If this Court permits the deletion of the names and identifying characteristics of the reviewers, the EEOC investigation would essentially be terminated upon review of the written evaluations of the reviewers, without giving the EEOC the opportunity to investigate the motives and reasons behind the evaluations if the EEOC deemed it necessary. Thus, the disclosure would be highly beneficial to the EEOC investigation.

Although this Court has found that disclosure of the names and identifying information of the reviewers would be highly beneficial to the EEOC, the fourth condition cited by Wigmore for recognizing a privilege against disclosure of communications requires this Court to balance that benefit against the injury that would inure to the University by the disclosure. The University maintains that the damage to the peer review process upon disclosure of the information would be devastating. That argument, however, is premature. Enforcement of the EEOC subpoena would require the University to disclose the evaluations in their entirety to the EEOC. The EEOC is prohibited from disclosing any information obtained in the course of its investigation prior to the institution of any proceedings under Title VII and any disclosure in violation of that prohibition is punishable by criminal charges. 42 U.S.C. § 2000e–8(e). Thus, the confidentiality of the information would be maintained by the EEOC. However, the University's concern stems not from disclosure to the EEOC but rather from the disclosure of the file to the charging party, Mr. Brookins, upon the completion of the investigation. 42 U.S.C. § 2000e–8(e); see, *EEOC v. Associated Dry Goods,* 449 U.S. 590, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981). The concern of the University regarding disclosure may be legitimate but that issue is not before the Court. Assuming that the information is only protected until Mr. Brookins institutes proceedings, the University at that point could move for a protective order under Rule 26(c) of the Federal Rules of Civil Procedure to protect the confidentiality of the information. See, *EEOC v. Bay Shipbuilding Co., supra.* Any damage that might result from disclosure would not occur at this stage of the EEOC investigation but rather at its conclusion. Accordingly, the benefit to the EEOC outweighs any injury to the University that might occur as a result of disclosure of the names and identifying information of the reviewers. The Court therefore holds that no academic privilege exists which would protect this information from disclosure in the context of the procedure in this case.

This Court also declines to protect this information from disclosure under its discretion to limit and control discovery pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. The cases cited by the University in support of their position are distinguishable from the case presently before the Court. In *Keyes v. Lenoir Rhyne College,* 552 F.2d 579 (4th Cir.), *cert. den.,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977), the court did not order the production of the faculty evaluations. The court balanced the need of the plaintiff for the information with the interest of the University in maintaining the confidentiality of the records and concluded that since the University did not rely on the evaluations for their defense, the plaintiff was not entitled to their disclosure. The court stated, however, that if the University had relied on the evaluations they would have had to disclose them. In *McKillop v. Regents of University of California,* 386 F.Supp. 1270 (N.D.Cal.1975), the court found that the information was protected from disclosure by the state law privilege for official information. The *McKillop* court stated further that the plaintiff could not get the files because the plaintiff had other means for discovering the motives of the individuals, namely, by deposition. The last case relied on by the University in support of its position is *Gray v. Board of Higher Education,* 27 F.E.D. Cases 256 (S.D.N.Y.1981), where the court protected the confidentiality of votes of faculty members on a tenure decision. The court concluded that the potential effects of disclosure to the peer review system were much greater than the potential benefit to the plaintiff from disclosure reasoning that the plaintiff already possessed substantial information regarding the tenure decision and the information sought was not probative of any motivation, discriminatory or otherwise.

In the case presently before the Court, the party seeking the discovery is the EEOC. The EEOC has the duty to investigate the charge filed by Mr. Brookins. Without the names of the reviewers, the

EEOC investigation would essentially be terminated upon review of the evaluations without any opportunity to investigate the motives behind the evaluations. Thus, the balancing of the interests to be considered in this case weigh decidedly in favor of disclosure of the entire files to the EEOC. *Cf., In Re Dinnan,* 661 F.2d 426 (5th Cir. 1981); *Lynn v. Regents of University of California,* 656 F.2d 1337 (9th Cir.1981); *EEOC v. University of Pittsburgh,* 643 F.2d 983 (3d Cir.1981); *Jepsen v. Florida Board of Regents,* 610 F.2d 1379 (5th Cir.1980); *EEOC v. University of New Mexico, Albuquerque, New Mexico,* 504 F.2d 1296 (10th Cir.1974).

## II.

■ The University's second objection to the EEOC subpoena is that the request is overbroad. Mr. Brookins' charge filed with the EEOC alleges that he was denied tenure because of his race. The University therefore maintains that the only files that are reasonably relevant to the EEOC's investigation are the files of other faculty members in the Department of Economics who were considered for tenure within a reasonable time before and after Mr. Brookins' tenure which took place in the Spring of 1980. The University suggested January 1, 1976 as a reasonable cutoff point for the EEOC's investigation.

The EEOC admitted in their brief that the consideration of which faculty members were eligible for tenure for a given time before and after Mr. Brookins' tenure decision is an appropriate consideration. The EEOC suggests the appropriate period of time for the production of files should be August 7, 1974 to the present, basing the beginning point of the investigation from the date Mr. Brookins began his employment with the University. The only issue before the court, therefore, is the appropriate date for the commencement of the investigation.

Section 709(a) of Title VII, 42 U.S.C. § 2000e–8(a) provides that the EEOC is entitled to information which is reasonably relevant to the charge under investigation.

The key in determining the appropriate time frame is reasonableness. The law is settled that the EEOC is entitled to secure information regarding files prior to the effective date of Mr. Brookins' claim. See, e.g., *Cormier v. P.P.G. Industries, Inc.* 452 F.Supp. 594 (W.D.La.1978). The question therefore is whether the EEOC request of August, 1974 as the beginning date of the investigation is reasonable.

The determination of a reasonable time frame should be made on a case-by-case basis and the rule should not be inflexible. See, *Cormier, supra.* In *Georgia Power Co. v. Equal Employment Opportunity Commission,* 295 F.Supp. 950 (N.D.Ga.1968), the court limited the discovery to five years prior to the date of the alleged discriminatory act, noting that while such a time limitation was admittedly arbitrary, the restriction was reasonable in the absence of special circumstances that would warrant a longer period. *Id.* at 954; *Cormier v. P.P.G. Industries, Inc.,* 452 F.Supp. at 596.

In the case presently before the Court, the EEOC is seeking discovery of information for a period of five years and 10 months prior to the date of the alleged discriminatory act. The EEOC maintains that the request is reasonable in light of the fact that the time frame corresponds to the time that Mr. Brookins was employed by the University. The Faculty Handbook, University of Notre Dame, 1981–82, provides the qualifications for tenure. Under Article III, The Faculty, Section 5, Tenure, the handbook provides that "[n]othing in this subsection (a) prevents the offer of tenure to a member who has served less than the specified maximum probationary period." This language appears to permit, at least in theory, the offer of tenure to an individual hired as an assistant professor at any time after employment. Therefore, assuming Mr. Brookins was eligible for tenure beginning August, 1974, all files of individuals eligible for tenure from that date forward are reasonably relevant to the EEOC investigation. Accordingly, the University should produce all the personnel files of the faculty members eligible for tenure from August, 1974 to the present.

### III.

The University's last objection to the EEOC subpoena is the EEOC's refusal to sign a nondisclosure agreement prior to the release of the information to the EEOC. The nondisclosure agreement proposed by the University would require the EEOC to obtain a nondisclosure agreement from Mr. Brookins, the charging party, prior to the release of the file to him by the EEOC. The agreement the University proposes to require Mr. Brookins to sign contains specific instructions and guidelines regarding the use and disposal of information contained in the EEOC file as well as specific provisions for enforcement of the agreement. In essence, the University is attempting to condition the release of information to the EEOC upon the signing of an agreement that would not only dictate how the EEOC could proceed with regard to its duties of disclosure but would also limit and control the actions of the charging party as well.

The University's concern regarding disclosure of the information stems primarily from the EEOC's authority to disclose the investigatory file to the charging party prior to the filing of an action in court. See, *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 101 S.Ct. 817, 66 L.Ed.2d 762 (1981). Specifically, the University is concerned that it will not have a forum in which to obtain a protective order against disclosure of the confidential information from the time the EEOC releases the investigatory file to Mr. Brookins until an action is filed in court.

The EEOC has construed the statute's prohibition of "public" release of information to permit prelitigation disclosure of investigative information to the parties where such disclosure "is deemed necessary for securing appropriate relief." 29 C.F.R. § 1601.22 (1979). However, before disclosing any information, the EEOC expunges the names, identifying characteristics and statements of any witnesses who have been promised anonymity and any person requesting confidential information must execute a written agreement not to disclose the information to any other person, except as part of the normal course of litigation after a suit is filed. EEOC Compliance Manual § 83.3(b). This EEOC procedure provides the protection requested by the University, the only difference being the terms and conditions of the agreement between the EEOC and the charging party. This Court believes that the plain language and spirit of Title VII and *EEOC v. Associated Dry Goods Corp.* do not permit the type of conditions the University seeks to impose on the EEOC and the charging party. Accordingly, this Court finds that the University may not condition the release of the information requested in the EEOC subpoena upon the signing of an agreement by the EEOC regarding nondisclosure.

### IV.

In light of the foregoing, this Court holds that no academic privilege exists which would protect from disclosure the names and identifying information of the reviewers of academic qualifications for tenure nor will the Court protect this information in its discretion pursuant to Federal Rule of Civil Procedure 26(c). The Court further holds that the University may not condition the release of the subpoenaed information upon the execution of an agreement by the EEOC regarding disclosure.

Accordingly, this Court hereby orders the respondent, University of Notre Dame Du Lac, to produce all the personnel files of faculty members eligible for tenure from August 1974 to the present in their entireties within 20 days of the date of this order. Each party to bear their own costs. SO ORDERED.