Forrest Louis Arceneaux v. State of Texas















IN THE
TENTH COURT OF APPEALS
 

No. 10-00-221-CR

     FORREST LOUIS ARCENEAUX,
                                                                         Appellant
     v.

     THE STATE OF TEXAS,
                                                                         Appellee
 

From the 177th District Court
Harris County, Texas
Trial Court # 839607
                                                                                                                
                                                                                                         
O P I N I O N
                                                                                                                

      Appellant Arceneaux appeals his conviction for aggravated kidnapping, enhanced by one prior
felony conviction, for which he was sentenced to Life in the Texas Department of Criminal Justice
- Institutional Division, and assessed a $10,000 fine.
      Appellant was indicted for aggravated kidnapping, enhanced by an allegation of a prior
conviction for murder. Appellant plead guilty to the aggravated kidnapping charge and true to the
enhancement.
      At punishment phase, the jury found that Appellant did not voluntarily release the victim in
a safe place.
      Appellant appeals on one point of error: “The evidence was insufficient to support the jury’s
finding that the complainant was not voluntarily released in a safe place.”
      Appellant plead guilty and was found guilty of aggravated kidnapping. Tex. Pen. Code §
20.04. This would be a conviction for a first degree felony unless under § 20.04(d) at the
punishment stage of the trial, defendant proves by a preponderance of the evidence that he
voluntarily released the victim in a safe place; in which event, the charge becomes a second degree
felony with a lower punishment range.
      Gail Ozane had a long term intimate relationship with Appellant and had a thirty-year old son
fathered by him. Ms. Ozane had a similar relationship with Joseph Harmon during much of this
same period. Appellant left the Raywood community in which all three lived and was gone for
a number of years. Appellant returned to Raywood on March 5, 1999. Harmon and Gail ended
their relationship and Gail moved in with Appellant. The renewed relationship did not go well. 
On August 5, 1999, Appellant came to Harmon’s home and followed him to the store. When they
arrived at the store, Appellant had a .20 gauge shotgun in his hand and told Harmon to call Gail
and tell her to meet him at the Crosby Motel in Dayton. Appellant and Harmon then drove to
Dayton. Gail also drove to Dayton, arriving at about 8:03 a.m. As she drove up, Appellant shot
her. She was taken to Herman Hospital where she underwent extensive surgery. Gail told police
that Appellant had shot her.
      That same evening, Nancy Sadler (complainant) and her sister, Sherry Porter, drove to
Dayton to purchase some fried chicken. Nancy was eight and one-half months pregnant and was
suffering from severe hypertension. Near the Crosby Motel, Nancy and Sherry saw Appellant
crossing the road. They stopped and Appellant put his shotgun to their windshield. Nancy and
Sherry jumped out of their car and told Appellant to take the car. Appellant pointed his shotgun
at Nancy, told them he needed to get out of there because the cops would be crawling, and that
he needed them to drive him. Appellant got in the backseat and directed Nancy to drive through
Dayton, then Liberty, and finally to Ames. Nancy was crying and Sherry engaged in conversation
with Appellant. Appellant told Nancy and Sherry he had shot to kill his wife, who had been
unfaithful. Throughout the drive, Appellant kept the shotgun aimed at the front seat. The two
women were scared and thought they were going to be killed. Appellant finally directed Nancy
down a rock road in the wooded area of Ames and directed her to stop in front of a house, where
he got out and left them. Nancy did not know exactly where she was, did not know where the
closest police station or hospital was, and did not feel safe. Nancy then let Sherry drive and they
proceeded to an Exxon Station in Liberty, where they sought help. Nancy was taken to a hospital
where her baby was born. She identified Appellant from a police photo spread. Sherry also
identified Appellant as their kidnapper from a photo spread.
      Appellant contends the evidence is insufficient to support the jury’s findings that the
complainant was not voluntarily released in a safe place, and argues that the case should be
reversed and remanded for a new punishment hearing.
      The standard for review in such situation is whether a neutral review of all the evidence, both
for and against the finding, demonstrates that the proof is so obviously weak as to undermine
confidence in the jury’s determination of the issue, and is clearly wrong and manifestly unjust. 
Johnson v. State, 23 S.W.2d 1, 11 (Tex. Crim. App. 2000). A Court of Appeals is not free to
reweigh the evidence and set aside the finding because the court feels that a different finding is
more reasonable. Clewis v. State, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996). Nor may a
Court of Appeals reverse a finding simply because it disagrees with the result. The Court must
defer to the findings of the fact finder and may find the evidence insufficient only when necessary
to prevent manifest injustice. Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).
      A jury verdict is not manifestly unjust merely because the jury resolved conflicting views of
the evidence in favor of the State. Cain v. State, 958 S.W.2d 404, 409 (Tex. Crim. App. 1997).
      The jury found that Appellant did not voluntarily release complainant in a safe place.
      In determining whether the victim was released in a safe place, the following factors may be
considered: 1) the remoteness of the location; 2) the proximity of authorities or persons who could
aid or assist; 3) the time of day; 4) climate conditions; 5) condition of the victim; 6) the character
of the location and surrounding neighborhood; and 7) the victim’s familiarity with the location or
surrounding neighborhood. Lavarry v. State, 936 S.W.2d 690, 696 (Tex. App.—Dallas 1996, pet.
dism’d); Harrell v. State, 882 S.W.2d 61, 65 (Tex. App.—Houston [14th Dist.] 1999, pet. ref’d).
      Nancy (complainant), testified they turned down a little white rocked road that goes into the
back of a mobile home park. Although there were some houses down the road, it was a wooded
area. Nancy believed she was going to die. She had never been to the place before and was not
familiar with the town of Ames, and had no idea where the closest police station or hospital was
located. It was dark. Sherry gave like testimony.
      Sgt. Saye testified that Ames is a small town and the street where Appellant got out, Cormier
Street, is a high crime area and high in drug traffic. Sgt. Saye is assigned to the town of Ames,
and has worked every kind of case on Cormier Street, from homicide to aggravated robbery to
sexual assault. Cormier Street has the highest crime rate of any area in Liberty County. Although
the Mayor of Ames lives on Cormier Street, one would not be safe if dropped off in front of the
Mayor’s house. The entire town of Ames is known for its high crime rate, and police get multiple
complaints on a daily basis from this area.
      Appellant’s witness, Mary Whitehead, testified that Ames had not been a safe place in the
past, but after the county received a drug grant to slow down traffic in the area, she considers
Cormier Street and the area to be a safe place.
      Appellant’s sister, Barbara Brooks, testified that she is familiar with the area and considers
it a safe place.
      The jury was entitled to believe from all the evidence presented that Appellant did not prove
by a preponderance of the evidence that he released the victim in a safe place.
      The evidence is factually sufficient to support the jury’s finding that the area where the
complainant was released was unsafe.
      Appellant’s point and all contentions made thereunder are overruled.
      The judgment is affirmed.

                                                                         FRANK G. McDONALD
                                                                         Chief Justice (Retired)

Before Chief Justice Davis,
      Justice Gray, and
      Chief Justice McDonald (Retired)
Affirmed
Opinion delivered and filed May 2, 2001
Do not publish



ing studies being conducted on behalf of [Relators] nor can they notice the
depositions thereof without further order of this Court;
 
Plaintiffs and their attorneys herein are prohibited from disseminating the information the
subject of this Order with any person not a party or attorney in the above styled and
referenced causes. All parties who review documents subject to the terms of this Order
are hereby bound by the terms of this Order and subject themselves to the jurisdiction of
this Court.

APPLICABLE LAW
      Relators can obtain mandamus relief only upon showing that the court committed a clear abuse
of discretion and that they have no adequate legal remedy. Walker v. Packer, 827 S.W.2d 833,
839 (Tex. 1992) (orig. proceeding). To demonstrate a clear abuse of discretion, Relators must
show “that the trial court could reasonably have reached only one decision.” Id. at 840. Even
if we would have decided the matter differently, we “cannot disturb the trial court’s decision
unless it is shown to be arbitrary and unreasonable.” Id.
      When a party has sought protection from a particular discovery request, “the court may make
any order in the interest of justice necessary to protect the movant from undue burden.” Tex. R.
Civ. P. 166b(5).
Specifically, the court’s authority as to such orders extends to, although it is not
necessarily limited by, any of the following:
 
a. ordering that requested discovery not be sought in whole or in part, or that the
extent or subject matter of discovery be limited, or that it not be undertaken at the time
or place specified.
 
b. ordering that the discovery be undertaken only by such method or upon such
terms and conditions or at the time and place directed by the court.
 
c. ordering that for good cause shown results of discovery be sealed or otherwise
adequately protected, that its distribution be limited, or that its disclosure be restricted.

Id.
      The Supreme Court has recognized that the otherwise “broad scope of discovery may be
circumscribed . . . by the legitimate interest of the opposing party in avoiding discovery based on
a compelling, particularized interest in nondisclosure.” Eli Lilly & Co. v. Marshall, 850 S.W.2d
155, 160 (Tex. 1993) (orig. proceeding). The Court held in Eli Lilly that because of “compelling
public interest considerations manifested by” certain federal regulations related to the discovery
request being considered, the plaintiffs were not entitled to discovery of the information sought. 
Id.
APPLICATION
Compelling Public Interest
      Relators contend they have asserted such a compelling public interest in the present case. 
Specifically, they argue “the public has a compelling interest in the results of these studies and,
therefore, has an aligned interest [with Relators] in the non-disclosure of this information prior
to the studies’ completion.” They also assert that compliance with Respondent’s order “would
harm the public” “which ultimately stands to gain from knowledge of the final results.” (quoting
Dow Chemical Co. v. Allen, 672 F.2d 1262, 1269 (7th Cir. 1982)).
      We agree that the public indeed has a compelling interest in the integrity of the studies being
conducted in this case. However, Relators’ own conduct in the execution of the studies presents
conflicting evidence on the extent to which they have sought to preserve this compelling interest. 
In addition, Pittelli equivocates in his affidavit on whether disclosure of the researchers’ identities
will in fact jeopardize the integrity of the studies or result in termination of the studies before
completion.
      Pittelli states that Wyeth retained a number of CRO’s to conduct the studies. He asserts that
an entity which retains CRO’s in studies such as these should not have “any way to know any
preliminary results” from the studies and that “the principal investigator—typically a leading
academic physician”—will conduct the final “independent review of the study data” and present
“the most important findings in a detailed report.” However, Relators’ counsel has provided this
Court with copies of the protocols for the ongoing studies which state in pertinent part:
The investigator agrees that Wyeth-Ayerst Laboratories, its employees, or agents, as well
as representatives of the U.S. Food and Drug Administration, will have the right from
time to time during the course of this study to audit and review pertinent medical records
relating to this clinical trial.

This raises a question about whether the studies being conducted at Wyeth’s behest are truly being
conducted independently.
      According to Pittelli, the CRO’s “tabulate[ ] the results” and “make[ ] the appropriate
statistical analysis.” “[T]he scientific method demands detailed statistical analyses.” (emphasis
added). If Wyeth has some involvement in the studies beyond establishing the protocols and
providing funding, then it has acted inconsistently with the “compelling public interest” it seeks
to preserve.
      Relators’ counsel argued before the trial court that so far as he knew, the only interim
documents relating to the studies which Relators possess are “status report[s]” in which a CRO
“would report back: We now enrolled 100 patients. So we’ve now enrolled 150 patients. So
we’re at this stage of the process in the protocol. This is how far down the road we are.” In
addition, counsel informed the court that Relators “have made reports to the FDA with respect to
the administrative status of how the science is going and where the process is.”



      Other than possibly revealing the identities of the CRO’s, we fail to see how disclosure of
these so-called “status reports” under the terms of Respondent’s order will impact the interest
Relators seek to protect. Moreover, Relators have cited no authority prohibiting disclosure of the
reports made to the FDA.
The Protective Order
      Relators agree that Plaintiffs are ultimately entitled to discovery of the documents sought. 
However, they argue that disclosure of this information before completion of the studies poses an
undue burden because it threatens the “compelling public interest” identified above. Thus, they
seek protective orders delaying the timing of the disclosure. See Tex. R. Civ. P. 166b(5)(b)
(protective order may require that discovery be undertaken “at the time or place specified” by the
court).
      Respondent granted Relators much of the relief they sought. He directed that the names of
the patients and physicians participating in the studies be redacted. Id. 166b(5)(a). He prohibited
Plaintiffs from contacting the researchers involved in the studies without prior permission of the
court. Id. 166b(5)(c). He prohibited them from disseminating the information disclosed pursuant
to his order to any person not a party to the two lawsuits before him. Id.



      Relators place much reliance on Eli Lilly to demonstrate that Respondent should have delayed
disclosure of the information sought. In that case, the trial court ordered unrestricted disclosure
of the identities of physicians who had reported possible adverse reactions to Prozac experienced
by their patients. Eli Lilly, 850 S.W.2d at 157. In this case however, Respondent placed
protective restrictions on the disclosure of the information sought. Thus, this case is
distinguishable from Eli Lilly.
CONCLUSION
      Relators’ own conduct in the execution of the studies presents a question about whether they
have acted inconsistently with the compelling public interest they seek to preserve. In addition,
their evidence does not clearly establish that disclosure of the researchers’ identities will in fact
jeopardize the integrity of the studies or result in termination of the studies before completion. 
Finally, Respondent’s order places numerous restrictions on the disclosure of the information they
seek to withhold.
      For each of these reasons, we cannot say Relators have satisfied the onerous burden of
demonstrating that Respondent “could reasonably have reached only one decision.” Walker, 827
S.W.2d at 840. Thus, they have failed to establish a clear abuse of discretion. Accordingly, we
deny Relators’ petition for mandamus relief. Relators must comply with Respondent’s order
within ten days of the date this opinion issues.
 
                                                                               REX D. DAVIS
                                                                               Chief Justice

Before Chief Justice Davis
      Justice Cummings and
      Justice Vance
Petition denied
Opinion delivered and filed October 2, 1998
Publish